# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| SAANEN, LLC, an Oklahoma limited liability company, | § § § | |
| Plaintiff | § | |
| v. | § | Case No. 20-3165 |
| | § | |
| SILICH CONSTRUCTION, INC., a Colorado corporation, and JOHN SILICH, an individual, | § § § | |
| | § | |
| Defendants | § | |

## ORIGINAL COMPLAINT

Plaintiff Saanen, LLC ("Saanen"), for its Original Complaint against the defendants, Silich Construction, Inc. ("SCI") and John Silich, states:

## PARTIES, JURISDICTION, AND VENUE

1.      Saanen is a limited liability company duly organized under the laws of the state of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.  The member interests in Saanen are entirely owned by Harry McMullan III, a resident of Oklahoma.

2.      SCI is a corporation organized under the laws of the state of Colorado with its principal place of business in Aspen, Colorado.

3.      John Silich is an individual who resides in the state of Colorado. Upon information and belief, John Silich was the sole owner of SCI, as well as its President and CEO, for the entire duration of SCI's involvement on the Project.

4.      Complete diversity of citizenship exists between Saanen, on the one hand, and SCI and John Silich, on the other.  The amount in controversy exceeds $75,000.00.  Therefore, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a).

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because Saanen's claim arises as a result of a contract to be performed in this district and actions of the defendants that occurred in this district.

## FACTUAL BACKGROUND

6.      On July 27, 2016, Saanen, as owner, and SCI, as contractor, entered into a contract (the "Contract") for the construction of a house located on real property owned by Saanen and located in Aspen, Colorado (the "Project").  The documents signed by the parties that comprised the Contract included (i) an AIA Document A101-2007 Standard Form of Agreement Between Owner and Contract where the basis of payment is a Stipulated Sum (the "Prime Contract"), and (ii) an AIA Document A201-2007 General Conditions of the Contract for Construction (the "General Conditions").

7.      Article 9 of the Prime Contract enumerates the documents that are incorporated into the Contract (the "Contract Documents").  In addition to the Prime Contract and the General Conditions, the Contract Documents consist of:

    a.  Contract Exhibit A – Proposal Pricing

    b.  Contract Exhibit B – Schedule

    c.  Contract Exhibit C – Final Plan Package

2

       d.  Contract Exhibit E[1] – Allowances

8.      Article 1 of the Prime Contract states that the Contract Documents represent the entire agreement between the parties.  General Conditions §7.2.1 requires that Change Orders be in writing and signed by the Contractor, the Architect, and the Owner.

9.      The architect on the Project is Poss Architecture + Planning ("Poss").

10.      Prior to the execution of the Contract, Excavation Services, who was employed by Saanen to construct a retaining wall on the property, obtained from HP Geotech a Subsoil Study dated February 20, 2014.  Saanen obtained an update of this report from HP Geotech dated September 14, 2015.  The HP Geotech Subsoil Study reports dated February 20, 2014 and the September 14, 2015 are hereinafter together referred to as the "HP Reports".

11.      The HP Reports were not included or incorporated into the Contract Documents.

12.      The Contract Documents contain no representation with respect to the presence or absence of bedrock or boulders at the Project site.

13.      Prime Contract §3.3 provides: "The Contractor shall achieve Substantial Completion of the entire Work not later than December 13, 2017."  General Conditions §8.2.1 states that the time limits specified in the Contract Documents are "of the essence"

---

[1] There is no exhibit D to the Contract.

and §8.2.3 states that the Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

14.     The Contract is a "Stipulated Sum" or fixed price contract.  The price agreed upon by Saanen and SCI was $8,911,864.97 (the "Contract Sum"). General Conditions §7.1.1 states that any changes in the Contract Sum must be made by Change Order or Construction Change Directive[2]. General Conditions §7.2.1 states that Change Orders are written instruments signed by the Owner, the Contractor, and the Architect that describe the change in the Work and the adjustment in the Contract Sum and Contract Time. A number of change orders were submitted by SCI and approved by Poss and Saanen.  The approved Change Orders increased the Contract Sum by $1,813,624.90 to a total Contract Sum of $10,725,489.87. The final four change orders proposed by SCI, #44, #45, #46, and #47, were not approved by either Poss or Saanen.

15.     General Conditions §7.4 provides for the architect to order minor changes in the Project work that do not involve an adjustment to the Contract Sum or the time to complete the Project.  Pursuant to this provision, Poss issued a number of Architect's Supplemental Instructions ("ASIs") directing minor changes in the work to be performed. Each ASI contained the following language:

> *The Work shall be carried out in accordance with the following supplemental instructions issued in accordance with the Contract Documents without change in Contract Sum or Contract Time.* ***Proceeding with Work in accordance with these instructions indicates your acknowledgment that there will be no change in Contract Sum or Contract Time.*** (Emphasis added.)

---

[2] No Construction Change Directives were issued in this Project.

16.     General Conditions §9.3.1 provides for SCI to receive progress payments. Prime Contract §5.1.4 provides that progress payments shall be based on the most recent schedule of values and shall allocate the entire Contract Sum among the various portions of the Work.  The portion of the Contract Sum allocable to completed Work was to be determined by multiplying the percentage completion of each such portion of the Work as set forth in the schedule of values by the share of the Contract Sum allocated to that portion of the Work in the schedule of values.  SCI was required to certify under oath the percentage completion of each portion of the work in order to receive a progress payment. General Conditions §9.4.1 provides that Applications for Payment ("Pay Apps") were to be submitted by SCI to Poss for "Architect's Certificate for Payment" prior to payment by Saanen.

17.     General Conditions §9.3.3 states that the issuance of a Pay App by the Contractor, subsequent to receipt of payment by the Owner, is the Contractor's warranty that, to the best of his knowledge, information, and belief, the entire Work is "free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim…."

18.     Over the course of SCI's work on the Project, SCI submitted a total of 34 Pay Apps (numbered 1 through 34) requesting progress payments from Saanen and certifying under oath the extent to which each portion of the work had been completed at the time of certification.

19.     Poss reviewed and certified SCI's Pay Apps 1 through 30, and Saanen paid them in full.  In paying Pay Apps 1 through 30, Saanen relied on SCI's certification regarding the extent to which each portion of the work had been completed. Furthermore, partway through the course of SCI's work on the Project, Saanen obtained a loan from its bank to enable it to complete the Project.  After such loan was made, each Pay App was presented to Saanen's bank, which then advanced the amount of each Pay App for payment to SCI.  Saanen's bank relied on SCI's certification regarding the extent of completion of each portion of the work in deciding to advance funds under the loan.

20.     John Silich personally signed Pay Apps nos. 2, 3, 4, 9, 14, and 24.  Based on information and belief, all Pay Apps not personally signed by John Silich were executed by employees of SCI directed by John Silich to certify under oath the extent to which each portion of the work had been completed. As to the Pay Apps submitted by SCI that overstated the percentage of completion of the Project, John Silich knew or should have known that each such certification was false.  In no case did SCI fail to deposit the funds sent to it on the basis of those representations.

21.     As the Project progressed, SCI's Pay Apps increasingly overstated the extent to which SCI's work on the Project had been completed at the time of the certification of each Pay App. Beginning with Pay App #25 for the period ending March 11, 2019, SCI increasingly reported more than 100% completion on certain line items in its Schedule of Values—a logical impossibility—when in most cases the work remained unfinished. This misrepresentation of the percentage completion of the Work gave rise to

the current situation, namely, that SCI was paid all but $479,979.04 of the Contract Sum with a Project that, including subcontractor bills unpaid by SCI, will cost Saanen at least $1,500,000 to complete.

22.     Upon approval of each Pay App, SCI executed a Lien Waiver.  SCI executed 30 Lien Waivers, including a Lien Waiver dated September 10, 2019 in connection with Pay App 30.  Each Lien Waiver stated the total cumulative amount that had been earned under the terms of the Contract through the effective date of the accompanying Pay App, and represented that such amount was "the entire amount due as of [that] date…."

23.     Each Lien Waiver also stated that in consideration of, and conditioned on payment of, the amount requested in the accompanying Pay App, SCI did "hereby waive and release any and every lien and claim … on account of labor or materials furnished by **Silich Construction, Inc.**" (emphasis in original) for the Project through the effective date of the Pay App.

24.     Among the Lien Waivers are two personally signed by John Silich, namely, #16, in the cumulative amount of $5,300,627.42 for work completed through October 31, 2017, and #24, in the cumulative amount of $7,946,710.08, for work completed through October 22, 2018.  Based on information and belief, all Lien Waivers not personally signed by John Silich were executed by employees of SCI directed by John Silich to execute each such Lien Waiver. As to each Lien Waiver submitted by SCI

that contained false information, John Silich knew or should have known that each such Lien Waiver was false.

25.     In paying Pay Apps 1 through 30, Saanen relied on SCI's Lien Waivers. Furthermore, Saanen's bank relied on SCI's Lien Waivers in deciding to advance funds under its loan.

26.     On February 26, 2020, approximately three and a half years after SCI had begun work on the Project, SCI proposed change orders #44, #45 and #46, all of which sought to increase the Contract Sum ex post facto.

27.     Proposed change order #44 did not propose to change the work to be performed by SCI in any way. Rather, it sought to *add* $558,742.71 to the Contract Sum for "General Conditions" in connection with previously approved change orders. Because all of the previously approved change orders set forth the agreement between the Contractor and Owner as to the cost of the Work described in the change order, SCI's proposed change order #44 represents its attempt to change the price of change orders to which it had previously agreed.

28.     Proposed change order #45 sought to add $199,781.00 to the Contract Sum for "Bedrock Chipping & Removal" that had been performed during the summer and fall of 2016

29.     Proposed change order #46 sought to add $51,301.40 to the Contract Sum for "Oversized Boulder Splitting & Removal" that had been performed during the summer and fall of 2016.

27255813_1

30.    In the narrative that accompanied change orders #45 and #46, SCI maintained that the HP Reports did not disclose the existence of bedrock and large boulders at the depths they were found. However, (i) the HP Reports are not Contract Documents and hence constitute no representation by Saanen, (ii) even if the HP Reports had been Contract Documents, they clearly indicate the presence of bedrock and boulders at shallow depths, and (iii) SCI failed to give timely notice of these supposedly hidden conditions within 21 days of encountering it as required by the Contract.

31.    General Conditions §3.74 deals with concealed or unknown conditions. A concealed condition must be of an unusual nature that materially differs from those ordinarily expected to exist in the area of the Work. According to §3.74, if the contractor encounters such an unforeseen condition, the contractor is required to give notice to the Architect and Owner **no later than 21 days after first observance of the conditions**. General Conditions §15.1.4 states, **"If the Contractor wishes to make a Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work**."

32.    SCI encountered boulders and bedrock within days of beginning its excavation work on the project in August 2016, but submitted no claim for additional compensation until February 26, 2020, three and one-half years and 30 Lien Waivers later. Each of those Lien Waivers stated that, in consideration of, and conditioned on payment of, the amount requested in the accompanying Pay App, SCI did "hereby waive and release any and every lien and claim … on account of labor or materials furnished by

**Silich Construction, Inc.**" (emphasis in original) for the Project through the effective date of the Pay App.

33.     On March 2, 2020, SCI proposed change order #47 in the amount of $44,189.86, describing it as SCI's cost for general liability insurance from August 15, 2018 to date.  All that was said about SCI-proposed change order #44 could be said about SCI-proposed change order #47 and will not be repeated here. Additionally, the entire period covered by this proposed change order was subsequent to SCI's contractual completion date.

34.     General Conditions §7.2.1 requires that the Owner and Architect agree on a change order for it to take effect.  Neither Saanen nor Poss approved SCI-proposed change orders #44, #45, #46 or #47.

35.     On March 5, 2020, SCI submitted Pay App 31 which sought a progress payment for work performed through October 31, 2019.  In Pay App 31, SCI represented that 99.93% of the Project was complete and that only $7,975.01 worth of work remained. Poss did not certify payment Pay App 31 and Saanen did not pay it.

36.     By letter dated April 1, 2020 from SCI's attorney Gregory Gordon, SCI demanded approval of the above-described SCI-proposed change orders.  In addition, SCI's attorney added the nugget that it was entitled to "Increased Costs and Time for ASI [Architect's Supplemental Instructions] Work."

37.     Accompanying the April 1, 2020 letter from SCI's attorney was a Notice of Intent to File a Lien Statement (the "Lien Notice").  The Lien Notice advised Saanen of

SCI's intent to file a mechanics and materialmen's lien statement in the amount of $1,280,933.12.

38.    By email dated April 16, 2020 from SCI's attorney Gregory Gordon to Les Rosenstein at Poss, SCI asked Poss to make a written recommendation/determination regarding "whether the bedrock and boulder conditions SCI encountered warrant an equitable adjustment to either or both Contract Time or Contract Sum per Section 3.7.4 of the A201-2007."

39.    By letter dated April 24, 2020, Poss declined to approve SCI's request, stating that it was unable to determine whether SCI has a valid claim to an equitable adjustment to either or both Contract Time or Contract Sum.

40.    On May 18, 2020, SCI's attorney sent an email to Saanen's attorney stating, among other things: "Following-up on our calls from earlier today, I wanted to address your specific question as to whether SCI will require some settlement be reached before it will continue work.  The answer is 'yes'."

41.    In a letter to Les Rosenstein from Saanen's counsel dated May 20, 2020, Saanen asked Poss to certify pursuant to Prime Contract §7.1 and General Conditions §14.2.1 the existence of "cause" for Saanen to terminate the Contract due to SCI's breaches.

42.    Shortly after learning of Saanen's request to Poss to terminate the Contract, SCI sought to terminate the Contract itself.  By letter dated May 22, 2020, SCI notified

11

Saanen and Poss of SCI's termination of the Contract because an act of government had prevented it from working on the Project of more than 30 consecutive days.

43.     By letter dated May 27, 2020, Poss certified that "cause" existed for Saanen to terminate the Contract due to SCI's failure to achieve substantial completion of the Project by December 13, 2017 as required by the Contract.

44.     On or about July 17, 2020, SCI filed a Statement of Mechanics' Lien asserting a lien against Saanen's property for the sum of $1,864,938.26.

45.     Certain of SCI's subcontractors have filed liens against Saanen's property due to the failure of SCI to pay those subcontractors.  Saanen has paid one of SCI's subcontractors the sum of $77,540.78 owed by SCI to the subcontractor for work on the Project.

46.     After the Contract was terminated, at Saanen's request, Poss contacted SCI's subcontractors to determine the status of their work and the status of payment to them.  Poss's investigation concluded that SCI's subcontractors are owed $539,358.04 for past work on the Project.

47.     In early June, 2020, Saanen requested Poss to contact suitable general contractors in the area that might complete the Project.  Saanen received five such proposals, two of which declined to give a cost estimate. Of the remaining three, one estimated the cost to complete the Project at $1,500,000 to $2,000,000. The second general contractor's estimate was $950,000 to $1,350,000, and the third estimated from cost to complete of $1,500,000 to $2,250,000. All those estimates **excluded** the cost of

12

paying SCI subcontractors for previously done work in order to secure their cooperation and assistance in completing the Project and to avoid the filing and enforcement of additional liens.

48.    General Conditions §14.2.3 states that if the costs and damages exceed the unpaid balance due to the Contractor, the Contractor shall pay the balance to the Owner.

49.    Upon information and belief, John Silich was sole owner, and acted as President and CEO of Silich Construction, Inc. for the entire period in which SCI worked on Saanen's project. John Silich signed the original contract with Saanen, numerous Pay Applications and Lien Waivers during construction, as well as the mechanic's lien against Saanen's property after SCI had been terminated.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

50.    SCI breached the Contract by, among other things, failure to achieve substantial completion of the Project within the time provided by the Contract, having failed to complete the Project by more than two years after the deadline specified in the Contract

51.    As a result of SCI's breach of the Contract, Saanen has suffered damages including, but not limited to, the cost to complete the Project in excess of the Contract Sum and the amount Saanen will be required to pay SCI's subcontractors for their work on the Project for which SCI failed to pay.

52.     Saanen has incurred costs and attorney's fees in bringing this action and is entitled to recover such costs and fees from SCI.

WHEREFORE, Saanen prays that it have money judgment on its First Cause of Action against SCI for damages in an amount to be proved at trial equal to the cost to Saanen to complete the Project in excess of the Contract Sum, prejudgment interest as provided by law, attorney's fees, costs of this action, and such other and further relief to which Saanen may be justly entitled.

## SECOND CAUSE OF ACTION
### (DECLARATORY JUDGMENT – LIEN INVALID)

53.     Saanen contends that the lien asserted by SCI against Saanen's property is invalid because, among other reasons, SCI breached the Contract, Saanen paid SCI more than SCI was owed for its work on the Project, and SCI's lien statement drastically overstated any amount for which it might arguably be entitled to assert a lien.

54.     There exists between Saanen and SCI a substantial controversy of sufficient immediacy and reality as to warrant the issuance of a declaratory judgment.

55.     An actual and justiciable controversy exists between Saanen and SCI as to whether SCI is entitled to assert a lien against Saanen's property.  A judicial declaration is necessary and appropriate so that Saanen may ascertain its rights regarding the lien asserted by SCI.

56.     Saanen has incurred costs and attorney's fees in bringing this action and is entitled to recover such costs and fees from SCI.

27255813_1

WHEREFORE, Saanen prays that it have judgment on its Second Cause of Action against SCI for a declaratory judgment declaring that the lien asserted by SCI against Saanen's property, as evidenced by the Statement of Mechanics' Lien filed July 17, 2020, is invalid, ordering that the Statement of Mechanics' Lien be expunged, awarding Saanen its attorney's fees and the costs of this action, and granting such other and further relief to which Saanen may be justly entitled.

### THIRD CAUSE OF ACTION
### (EXCESSIVE LIEN)

57.     SCI filed its Statement of Mechanics' Lien for an amount greater than is due without a reasonable possibility that the account claimed is actually due to SCI.

58.     Pursuant to CO Rev. Stat. § 38-22-128, Saanen is entitled to judgment against SCI determining that any rights SCI might have had against Saanen's property are forfeited, and for damages in an amount equal to Saanen's costs and attorney's fees caused by the filing of such lien statement.

WHEREFORE, Saanen prays that it have judgment on its Third Cause of Action against SCI determining that any rights SCI might have had against the Property are forfeited, and for damages in an amount equal to Saanen's costs and attorney's fees caused by the filing of such lien statement and granting such other and further relief to which Saanen may be justly entitled.

27255813_1

## FOURTH CAUSE OF ACTION
### (MISREPRESENTATION – PAY APPS)

59.     To the extent SCI's Pay Apps overstated the percentage completion of the Project, John Silich and SCI knew or, in the exercise of reasonable care, should have known that the percentage completion stated in its Pay Apps exceeded the actual percentage completion of the Project and that the representations of percentage completion contained in the Pay Apps were false.

60.     John Silich and SCI made the misrepresentations in order to cause Saanen to make progress payments in amounts that were more than were justified by the actual percentage completion of the Project.

61.     John Silich and SCI made the misrepresentations with the intention that Saanen would rely on them to their detriment.

62.     Saanen did rely to its detriment on the representations made by John Silich and SCI because Saanen made progress payments in amounts that were more than were justified by the actual percentage completion of the Project.

63.     Saanen has suffered damages as a result of the misrepresentations made by John Silich and SCI in an amount to be proven at trial.

WHEREFORE, Saanen prays that it have money judgment on its Fourth Cause of Action against John Silich and SCI for damages in an amount to be determined at trial, prejudgment interest as provided by law, attorney's fees, costs of this action, and such other and further relief to which Saanen may be justly entitled.

27255813_1

## FIFTH CAUSE OF ACTION
### (MISREPRESENTATION – LIEN WAIVERS)

64.     John Silich, personally, or individuals employed by SCI and acting under John Silich's orders and with his approval, signed 30 Lien Waivers which represented that the total cumulative amount of progress payments requested through the date of the Lien Waiver was "the entire amount due as of this date."

65.     SCI has asserted in its Statement of Mechanics' Lien and elsewhere that, prior to the date of the Lien Waivers, or some of them, that the statements in the Lien Waivers were false because additional amounts are owed for work performed prior to the dates of the Lien Waivers.

66.     John Silich and SCI knew or, in the exercise of reasonable care, should have known that SCI intended to claim additional amounts for work performed prior to the dates of the Lien Waivers and that the representations in the Pay Apps to the effect that no additional amounts were owed were false.

67.     John Silich and SCI made these misrepresentations in order to cause Saanen to make excessive progress payments and continue with the Project.

68.     John Silich and SCI made the misrepresentations with the intention that Saanen would rely on them to their detriment.

69.     Saanen relied to its detriment on the representations made by John Silich and SCI, making progress payments that far exceeded the percentage of the Work accomplished on the Project.

27255813_1

70.     Saanen has suffered damages as a result of the misrepresentations made by John Silich and SCI in an amount to be proven at trial.

WHEREFORE, Saanen prays that it have money judgment on its Fifth Cause of Action against John Silich and SCI for damages in an amount to be determined at trial, prejudgment interest as provided by law, attorney's fees, costs of this action, and such other and further relief to which Saanen may be justly entitled.

Respectfully submitted,


*s/ Ross A. Plourde*
ROSS PLOURDE, OBA # 7193
JEREMIAH BUETTNER, OBA #21615
MCAFEE & TAFT A PROFESSIONAL
CORPORATION
Two Leadership Square, Tenth Floor
211 N. Robinson
Oklahoma City, Oklahoma 73120
405/235-9621
405/235-0439 (FAX)
Ross.plourde@mcafeetaft.com
jeremiah.buettner@mcafeetaft.com

*Attorneys for Plaintiff*

27255813_1